COMMONWEALTH OF KENTUCKY *v.* ABRAHAM BASSFORD and
JOSEPH B. NONES.

An act of the state of Kentucky authorized certain persons to raise, for the benefit
of a college, $100,000 "by lottery, in one or more classes, as to them should seem
expedient." They were required to execute a bond to the state, in the penalty of
$100,000, conditioned for the faithful discharge of their duties; also to pay "all
such prize or prizes as might be due agreeably to the scheme which they might
agree upon and publish," and provided such scheme should not reserve more than
20 per cent., and afterwards to pay to the college all sums which might be due in
consequence of the drawing of the lottery. They were also authorized to sell
"the scheme, or any class or classes of said lottery," for not less than 10 per cent. on
the amount proposed to be drawn, to any person who should enter into a bond to
the state, with good security, conditioned faithfully to comply with the terms of
the act.

The original managers gave the bond required of them, but, without doing any thing
further under the act, they sold the whole grant to other parties, who entered into
a bond to the state, in the penalty of $8,500, with the defendants as sureties.

A drawing of the lottery was had, and one Lee held a ticket, which, according to
the conditions of the scheme adopted by the new managers, entitled him to a prize
of $8,000. Failing to receive the money, he sued the sureties upon the bond last
mentioned, in the name of the Commonwealth of Kentucky.

*Held*, that the act contemplated a responsibility on the part of the original managers;
that they were bound to arrange and publish the scheme of the lottery, in a class
or classes, and that then they might sell the same; that they could not sell the
whole grant with the entire arrangement of the lottery; that they having done so,
no lottery could be drawn under the act; and that the defendants were not liable
upon the bond.

*Held*, also, that from the fact that the bond was given to the state and the lottery
drawn under it, it does not follow that the state had a right to enforce it without
reference to the statute, the bond being executed in pursuance of a statutory pro-
vision.

There being nothing in the act permitting the purchasers from the original managers
to sell out to third persons in whole or in part; to entitle the holder of a ticket to
a prize, he must have shown that the same was procured from the original purcha-
sers, or from their authorized agents in their name.

The breach of a voluntary bond given to a state to do some act for a third person,
would not afford any substantial ground of damage upon which the state could
recover. It would require some legislative authority for the taking of such a bond,
before the state could recover upon it beyond nominal damages.

ON the 16th of February, 1837, an act was passed by the legislature of Kentucky, for the benefit of Shelby college.

Section first authorized James Bradshaw, Samuel Tevis, John Lane and others, " to raise, by way of lottery, in one or more classes, as to *them* might seem expedient, any sum, not exceeding $100,000, to be appropriated to the use of that college." The said managers, or such of them as might think proper to act, were required, before entering upon the duties assigned them by the act, to file a bond in the county court of Shelby, in the penalty of $100,000, conditioned for the faithful discharge of the duties enjoined on them. It was provided that the said bond might be sued in the name of the commonwealth of Kentucky—the obligee therein named—for the use and benefit of persons injured by a breach of it. It was declared the duty of the managers, within ninety days after the drawing of the said lottery, or any class thereof, to pay to the holder of a ticket drawing a prize, " all such prize or prizes as may be due, *agreeably to the scheme* which they, the said managers, may agree upon and publish," such scheme not to reserve to the managers more than twenty per cent. of the prizes drawn. The appointment of clerks was also authorized, with " other officers necessary to conduct the lottery," all of whom were to be sworn.

Section second required the managers, within ninety days after the drawing of the lottery, or any class thereof, to pay to the trustees of Shelby college, all sums of money which might be due in consequence of the drawing of said lottery, after all prizes should have been paid.

Section third authorized the said managers to sell and dispose of " the scheme, or any class or classes of said lottery," to any person or persons " who shall enter into bond with good security, conditioned well and faithfully to comply with all the terms and conditions of this act, payable to the commonwealth of Kentucky," which bond, it declares, shall be received by the said managers, and be by them filed in the said Shelby county court, before said lottery, or any class or classes thereof, shall be drawn. It also provided, that *no sale* should

be made of any class or classes, for less than ten per cent. upon the amount proposed to be drawn.

In 1838, on the 1st and 13th of February respectively, the act was amended, but the amendments contained no provision bearing upon any question in this suit.

On the 10th of April, 1837, three of the managers, whose names are given above, filed the bond required of them by the act; but after a delay of three years, without doing any thing further to carry out the objects or comply with the directions of the act, they sold the grant, or a general authority to act at discretion under the act, to Jewett and Smith, for a sum not less than ten per cent. of the amount which the latter proposed should be drawn.

A bond was duly filed, executed by Jewett and Smith and by the defendants, to the commonwealth of Kentucky, in the penal sum of $8,500. The bond recites, that "whereas the said Nathaniel G. Jewett and John L. Smith have purchased the grant of Shelby college lottery from the managers of the said lottery, authorized by an act," &c.; " and the said Jewett and Smith intend at present not to have any prize in the drawing of said lottery greater than the sum of ten thousand dollars;" and the bond then declares: " Now if the said Jewett and Smith shall, within ninety days after any of the drawings of said lottery, pay or cause to be paid, to the person or persons holding a ticket or tickets thereof, all such prizes as may be drawn by any individual or individuals, agreeably to any such drawings, and shall furthermore not reserve more than twenty per cent. upon any such prizes so drawn, and shall not increase the capital prize in any such drawings beyond the said sum of $10,000, without first executing a new bond with good security, in such penalty as may be sufficient to secure the payment of such increased prize, and in all things conform to and well and faithfully comply with all the terms and conditions of said act, then this obligation to be void, otherwise, to remain in full force; and it is further provided, that this bond is not to become void by a recovery of the penalty, but

may be sued on from time to time, by any persons injured by breach of the conditions thereof."

This suit was brought upon the above bond, by one William H. Lee, a citizen of Kentucky, in the name of that commonwealth, against the defendants.

The declaration, which was under the old system of pleading, set out the bond and its conditions, and the act of the legislature of Kentucky at length, and then averred, 1. That Bradshaw, Tevis and Lane- did enter into a bond, &c., and became thereby the managers of the said lottery. 2. That Jewett and Smith, on the 18th of June, 1840, at Louisville, purchased " of the said managers," for and in consideration of a sum " not less than ten per cent. of the amount proposed to be drawn in the said class or classes sold as aforesaid, the grant or scheme of said Shelby college lottery, and did thereupon, together with the said defendants, enter into the said bond before set forth." 3. That under and by virtue of said act, a drawing of said lottery was had on the 30th of November, 1841, at Louisville, in pursuance of a published scheme of said lottery, denominated class No. 88, new series. 4. That one William H. Lee, a citizen of Kentucky, for valuable consideration, became and is the holder of a ticket in said class and series, having on it the combination numbers, 18, 36, 77, which, according to the conditions of the scheme, entitled the holder to a prize of $8,000, subject to a deduction of 15 per cent., whereby Lee became entitled to demand and receive the sum of $8,000; that more than ninety days have elapsed; that he has requested payment of Jewett and Smith, but neither of them, nor either of the defendants, has paid; wherefore, &c.

The defendants pleaded, 1. That the said writing obligatory is not their deed. 2. That the said William H. Lee did not become the holder of a ticket in the class and series in the declaration mentioned, &c. 3. That the ticket mentioned did not, " according to the terms and conditions" of the scheme or drawing mentioned, *draw* or *entitle* the holder to a prize of $8,000, or to any part of such prize. 4. That there was not, under and by virtue of said act, any drawing of said lottery

as mentioned, in pursuance of said published scheme of said lottery, &c. These pleas all conclude to the country. 5. That the ticket with the said numbers, 18, 33, 77 thereon, was not made, issued, sold or delivered by the said Jewett and Smith; concluding with a "verification" and prayer for judgment.

To this 5th plea, the plaintiff replies, that this ticket was made, issued, sold or delivered by the said Jewett and Smith; in manner and form, &c.

The cause was referred to JAMES S. BOSWORTH, Esq., as sole referee, by whom a mass of testimony was taken, principally obtained upon commissions issued to Kentucky. His finding upon the several issues was as follows: 1. That there was not a drawing of said lottery, under and by virtue of said act, on the 30th of November, 1841. 2. That William H. Lee is not the holder of a ticket, &c., in a class and series drawn under and by virtue of said act. 3. That the ticket in question did not entitle Lee, according to the drawing of said lottery, to a prize of $8,000. 4. That Jewett and Smith neither made, sold, issued or delivered the ticket in question. 5. That the bond or writing obligatory declared upon, is the deed of the defendants. 6. That nothing is due from the defendants to the plaintiff.

The referee held in effect, that the acts of Smith and Jewett were void under the act, on the ground that the said act did not authorize the sale to them by the original managers, of all the power and authority confided to them, and a transfer to the purchasers of a right to exercise all the discretion which the act reposed in them. They did not sell a scheme, which they, the managers, had agreed upon and published, nor any class or classes in the lottery, devised by them. They did nothing further under the act than file their original bond.

The evidence tended to show, that although Jewett and Smith were engaged in the selling of tickets and drawings of classes and schemes by virtue of their purchase of the lottery, yet that the defendants, as reputed managers, got up "class No. 88, new series," and issued and sold the tickets, of which Lee held one. For this additional reason, consequently, the

referee held that the drawing of this class was not a drawing of the said lottery under the said act.

On the argument before the referee, it was urged, among other things, against the plaintiff's right to recover, that the bond appeared on its face to be in furtherance of a lottery, and was therefore void, because against public morals, repugnant to our constitution and laws, and against public policy as recognized in this state. The referee decided that this objection was not available under the pleadings, and could only be raised by demurrer or motion on arrest of judgment; but he concluded his reasons for his report in favor of the defendant, as follows: ·  ·

"If the bond was in furtherance of ordinary business transactions, not repugnant to the policy, laws or constitution of this state; of transactions, whose legality, if they can be treated here, under any circumstances as legal, does not depend upon showing a positive law of the state where they occurred authorizing them, and on showing, also, the conformity of the transactions with such law; it might be urged with great force, that if the defendants took upon themselves the performance of duties which they agreed by bond should be faithfully discharged by Jewett and Smith, they should not be allowed to object, in a suit upon the bond, that what was done was done by strangers without authority. But such a proposition cannot be maintained in such a case as this."

Judgment having been entered upon the report for the defendants, an appeal was taken in behalf of the plaintiff.

*P. Callaghan* and *Hiram P. Hastings*, for the plaintiff.

I. The report is based upon a point not in issue.

1. The report is based entirely upon the idea that the original managers of the lottery could not dispose of the grant until they had first prepared a scheme to be sold, defining the classes, drawings, &c., which their grantees were authorized to effect, and that the issue taken by the fourth plea upon the averment in the declaration, "that under and by virtue of the

act a drawing was had Nov. 30th, 1841, at Louisville Ky., in pursuance of a published scheme of said lottery, denominated class No. 88, new series," was not proved, for want of evidence of the pre-requisite act of the original trustees in preparing such scheme; all the other conclusions are built on this; and if in this there is error, the whole report must be set aside.

2. It was not necessary to prove the matters recited in the bond or averred in the declaration, and not denied by any plea.

3. To prove the issues actually taken, it was only necessary to prove the substance of the matters of fact which were directly denied, and not the matters of law, or facts denied only by way of inference or argument from the mixed denial of law and fact in the same sentence. The denial that an act was legally done cannot put in issue a prior distinct averment of the declaration upon which no issue is taken directly.

4. These defendants, by the bond, recite that "Jewett and Smith have purchased the grant" of said lottery from the managers of said lottery, "authorized by the act," &c., and the declaration sets this out with the whole act, and avers that they purchased "the grant or scheme for a sum not less than ten per cent. of the amount proposed to be drawn in the said class or classes as aforesaid," and that the defendants entered into the bond thereupon, which was duly received by the managers, and filed in the Shelby county court. All this is admitted by this issue.

5. Having set forth what was done, the declaration proceeds to state that there was a drawing of a certain class of said lottery on a certain day, "under and by virtue of said act;" but these last words are not allegations of fact, but an averment of law that the acts and precedent averments authorized such drawing, and might as well have been omitted; for the argument of the referee could first as well have been built upon the question, whether the drawing was "of the said lottery." The issue upon this averment was whether or not the drawing of that class in that lottery or what was assumed to be that lottery by Smith and Jewett, actually took place as

matter of fact in pursuance of a published scheme of said lottery. If the legality of the drawing was intended to be questioned, the facts should have been spread upon the record presenting the illegality by plea, or a demurrer interposed if they appeared from the declaration.

6. If this plea had admitted what is proved, that is, that Smith & Jewett assumed to have due authority to authorize said drawing, and that they caused the same at the time and place mentioned, in pursuance of a published scheme therefor, but that the same was not under and by virtue of said act, it is plain the plea would have been good for nothing, because it would only have averred the law; and yet the learned referee has treated this as the real issue, and disregarded the facts as of no consequence.

7. If the previous averments were sufficient to show that if a drawing took place at the time averred, it was under and by virtue, that is, authorized by the act, then an issue should have been taken upon one of such averments; if they were not sufficient, a demurrer should have been put in; or if it was not necessary in the declaration to show affirmatively that all the pre-requisites to a sale took place, and the absence of any such pre-requisite would avoid the bond, the defendants should have shown affirmatively by plea the want of such pre-requisite, and prayed the judgment of the court whether that did not avoid the bond. They would thus have tendered an issue of law or fact, whichever the plaintiffs might choose to take upon the point.

8. This plea admits the sale of the grant or scheme at a sum not less than ten per cent. upon the amount of prizes proposed to be drawn to Smith & Jewett, and that they gave the bond in question for the faithful performance of the duties imposed by the act, which the referee admits were the same as those of the original managers. If an issue had been taken on this averment, as every thing essential to the truth of the affirmative would have been presumed after verdict, perhaps it would have required proof of the publication of the scheme by the managers, by way of showing what amount of prizes was proposed to be drawn and what amount was paid. The failure to

take any issue upon it is equivalent in effect to such issue taken, and a verdict for the plaintiff. The averment, therefore, embraces the publication of a scheme, if that was necessary, and it is admitted by the plea.

9. If any prior act could authorize the sale of the grant of the lottery, these defendants were stopped by their recital in the bond that such sale and purchase had been made, from denying the performance of such acts. Setting out the bond with this recital was all that was necessary as against these defendants. Even the existence of the Kentucky law would be conclusively proved here by such recital, like any other fact. Holding them to this, they are chargeable with the correct management of the drawings of the lottery, and the actual drawing proved, was binding on them.

II. The referee is entirely mistaken in supposing that the managers were required to publish a scheme before they could sell the whole scheme or grant.

1. By the first section the original managers were authorized to raise the $100,000 by way of lottery in one or more classes, as to them might seem expedient, and required to give bond for the faithful performance of the duties imposed by the act, one of which is therein declared to be to pay the prizes within 90 days after the drawing of the said lottery, or any class thereof, agreeably to the scheme which they may agree upon and publish, and not to reserve over 20 per cent. upon the prizes. This is the only provision about publishing any scheme by said original managers, and applies, by its language, exclusively to such drawings as they conducted, and as required them to pay the prizes, and allowed them to reserve a per centage on the prizes.

2. The third section provides a substitute, in whole or in part, as they might think proper, for this publication of a scheme and drawing themselves, by allowing a sale of the whole scheme, i. e., plan of the act to raise $100,000 by way of lottery, or of any class or classes of said lottery, to any person who would give bond "faithfully to comply with all the terms and conditions of the act," which bond should be filed by the drawing

of the said lottery, or any class or classes thereof, at a sum not less than 10 per cent. upon the amount of prizes. This puts the vendees of the whole grant or scheme in the exact position of the original managers, except they were only to pay 10 per cent. in lieu of the 20 reserved on the prizes, and made it the duty of such vendees to publish the scheme or schemes in one or more classes, as "they should deem proper," and to pay the prizes, according to the scheme which they should agree upon and publish.

3. The scheme, as used by this section, means the plan of raising $100,000 by way of lottery, less a per centage of not less than 10 per cent. upon the amount of prizes proposed to be drawn. This was all that was material to the state or to Shelby college. The declaration avers that the sale was made on these terms; this was all the scheme so far as related to its sale. The detailed schemes of the managers for the time being, would regulate the right of the ticket holders.

4. So the original managers, as well as the purchasers and these defendants, understood the act, and so no doubt it was understood by all the people of Kentucky. This bond provides that Smith & Jewett shall not have any prizes over $10,000, until they shall first file a new bond, &c., showing that they were to make the scheme; but then they could not understand this act so well as the learned referee, whose ingenuity has found out a way of construing it so as to decide against the plain justice of the case, and let the speculators pocket the ticket money without paying the prizes.

III. It was not necessary for the plaintiff to aver or prove a conformity to the law on the part of the defendants, and the violation of the law on the part of Smith & Jewett would not exempt them from liability on this bond, given to secure the payment of the prizes, which was one of the express objects of the law.

1. A lottery was not void at common law nor by the laws of nations in general, and therefore a lottery contract made out of this state, or to be executed out of it, is presumed to be a legal obligation until proved otherwise by the *lex-loci*.

2. Lotteries cannot be regarded as so grossly immoral as to be presumed to be against the law of any state; they have been licensed and allowed in this state, and are no more regarded as immoral than the sale of ardent spirits.

3. The act of the Kentucky legislature sanctions this particular lottery, and this is sufficient to do away with any presumption as to the immorality of the subject matter, and place it on a par with any other business transaction.

4. The referee concedes, that in any ordinary business transaction, Jewett & Smith would be held responsible on this bond.

5. Jewett & Smith, by assuming to purchase this lottery, undertook at their peril to see to the legality of the transfer; and having received the benefits of the lottery, that is, the pay for the tickets, on the pretence of being the rightful purchasers, they are estopped from denying their being such purchasers.

6. At all events paying the prizes was lawful, and this they bound themselves to do.

7. There is no doubt on the evidence that Smith & Jewett assumed to be lawful owners and managers of the lottery; that they caused the management to be carried on under the styles of Smith & Jewett, Jewett, Smith & Co., Smith & Co., Smith & Bassford, and A. Bassford & Co., and that the ticket in question was sold under this continuous management, under the guaranty of this bond by these very defendants. It was not necessary that Smith & Jewett should publish their schemes and tickets with their own names to them, but was competent for them to authorize the style of any of their agents or vendees to be used; A. Bassford & Co. or Stanley & Staples would equally bind them.

IV. This bond is given to the commonwealth of Kentucky, and the plea in question admits its execution to the commonwealth. The commonwealth is here seeking to enforce it. The state cannot be a party to an illegal bond; the admission of a bond to which the state is a party is an admission of its legality in that state. The state of Kentucky had a right to receive this bond, and dispense with any of the conditions upon which it was at first authorized to be given. *A fortiori,*

when they take a bond reciting a sale of the lottery, which was only authorized on certain conditions, it is to be presumed that such conditions have been complied with.

*James T. Brady*, for the defendants.

I. The evidence of the bond in suit is not sufficiently proved, because, 1. Lane is the only witness who proves its execution by Jewett & Smith, and 2. He is incompetent, because being one of the managers of the lottery, he is bound by the law of Kentucky and his bond, to secure the payment of the prize in question in this suit.   3. Therefore he is interested to charge that liability on the defendants.

II. The bond in question cannot be enforced in this suit, because on its face it appears to have been given in furtherance and promotion of a lottery, and is therefore void ; because, 1. It is against public morals.   2. It is repugnant to the principles and provisions of our constitution and laws.   3. It is against public policy as recognized in this state.

III. For the reasons stated under the second point, our courts cannot, from any consideration of comity, give the plaintiffs a remedy here which could not be had under a similar bond given by or to any of our citizens.

1. The consideration and condition of the bonds are both immoral in their nature.   All laws prohibiting gambling and lotteries are founded exclusively on the idea of such proceedings being immoral.

2. No state of our confederacy should be deemed entitled to comity, so far as to authorize its enforcing in our courts of justice a special law repugnant to its own general legislation, and totally opposed to the letter and spirit of our constitution and laws.   (*Hunt* v. *Knickerbocker*, 5 J. R. 327.)

IV. The bond in question is void at all events, because,

1. The state of Kentucky only authorized the taking of a bond in a certain manner, and on a certain contingency, viz., on the sale, by the "managers," of any "scheme," "class or classes," arranged by the said managers, and published *by them*.

The bond in this suit was given on a transfer, by the managers of the whole *grant* of the lottery, a transfer which they had no right to make. The legislature of Kentucky having only authorized what has just been stated, the managers could not enlarge that authority without the consent of the state, and such consent could only be evidenced by a legislative declaration or act. (*Collins* v. *Blantern*, 1 Smith's leading cases, 154.)

V. The issues of fact, in this case, are to be passed upon by the referee, whether material or immaterial. The nature of the judgment to be given on his finding can only be determined by the court on an application *non obstante veredicto.*

VI. The prominent issue in question now is, whether or not Jewett & Smith sold the ticket in controversy. That issue cannot be amplified so as to involve the inquiry whether, by their *omission*, other persons sold the ticket.

VII. If persons acting for or under the authority of Jewett & Smith, and responsible to them, sold the ticket, then that sale might be regarded as the act of J. & S., under the well known maxim, *qui facit*, &c.; but the proof in the case (if there be any legal proof on the subject) shows that Jewett & Smith did not delegate any authority to either Bassford & Smith or A. Bassford & Co., to act for them; on the contrary, Jewett & Smith, at several times, absolutely transferred all their interest in the lottery, and ceased to have any connection with it. The defendants, who are mere sureties, cannot be responsible for acts of substituted persons, for whom they never became bound. It was not in the power of the principals to enlarge the sureties' liability beyond the terms of the obligation. (*Dobbin* v. *Bradley*, 17 Wend. 422; *Walsh* v. *Bailie*, 10 J. R. 180; *Robbins* v. *Bingham*, 4 J. R. 476.)

VIII. If it be contended that Jewett & Smith had no right to sell their interest in the lottery, then the defendants submit in answer to this view,

1. That Jewett & Smith *could* transfer their interest, but *not* in such a manner as to continue the liability of their sureties for the acts of the transferees.

2. If J. & S. could not legally transfer their interest, then

clearly the whole lottery was conducted by strangers, without any right, and not in conformity with the law of Kentucky; and,

3. As a consequence of the view suggested in the third point, the defendants, who were only bound for the *payment* of *prizes* in a lottery to be carried on according to the law of Kentucky, cannot be held liable for a misfeasance.

4. The state of Kentucky (if it ever acquired any right to or under the bond of J. & S. and the defendants) obtained only security for the prizes of a lottery to be in conformity with that law, and if a lottery was conducted by *strangers*, without any supervision of the managers, then the only persons liable are the strangers or persons by whom the tickets were in fact issued.

IX. There is no legal proof that either Stanley & Staples, Jewett, Smith & Co., Bassford & Smith, A. Bassford & Co., or Smith & Co. acted for, or under the authority, or with the assent of the defendants.

X. There is no proof that Jewett & Smith, or either of them, had any connection with the sale of the ticket in question, but on the contrary, there is clear and express proof that neither of them was concerned in that transaction in any manner whatever.

By the Court. INGRAHAM, FIRST J.—The referee in this case has found upon the facts that the bond was executed by the defendants; that the ticket referred to was held by the plaintiff; but that such ticket was not made by Jewett & Smith; and upon all the other facts raised by the pleadings, he found for the defendants.

So far as he has found upon matters of fact, there is no reason for an interference with his report, unless we should adopt the views suggested by the plaintiff's counsel, that such finding was rather a finding of law than of fact; that the referee, in finding against the plaintiff, did so upon the presumption that the provisions of the law authorizing the lottery had not been complied with. So far as any thing appears in the re-

port of the referee, there is nothing to justify such an opinion. But in the paper annexed, containing the reasons for the referee's decision, it appears that he was of the opinion that the original managers could not sell the whole grant made to them by the act. That before selling a scheme of the lottery, the managers were bound to publish the scheme as adopted by them; and that as no such proceedings ever took place; on the part of the managers, that there could not be a lottery drawn by the purchasers under that act, and, therefore, that there was nothing due from the defendants.

I am inclined to concur with the referee in his conclusion, that under the act of the legislature of Kentucky the managers could not sell the whole grant, and with it the entire arrangement of the lottery. That they were bound to arrange the scheme of the lottery before they sold it, and that unless such preliminaries are complied with, the defendants are not responsible under this bond.

The authority to dispose of a scheme, or a class or classes, did not extend to a sale of the whole grant under the act. The act contemplated responsibility on the part of the managers, and required from them security for $100,000. If their duties could be discharged by a sale of the whole power vested in them, on a security for merely $8,500, such a condition would have been idle. The fair construction of that section is, that they were to make and publish the scheme of the lottery in a class or classes, and then that they might sell the same as provided in the third section.

The argument used by the plaintiff's counsel, that the defendants are estopped by the recitals in the bond from showing that the proceedings of the managers were contrary to law, is not sound. Such a rule would hold a party in opposition to the usury law, or the statute of frauds, or any other statute which makes a contract void for the violation of it.

But there is no such admission in the bond. It only recites that Jewett & Smith had purchased the grant of a lottery authorized by an act of the general assembly of Kentucky, &c. It does not recite or admit any authority to sell, or any

compliance with the provisions of the statute which were necessary to authorize the sale.

There is more difficulty in the point, that this bond being given to the state, and the lottery having been drawn under it, the state has a right to enforce it, without reference to the statute. Treating it as a mere voluntary bond, not given in pursuance of any statutory provision, such a position might perhaps be maintained. But in such a case there is no evidence of any damage to the state upon a breach of such a bond. A voluntary bond given to a state, to do some act for a third person, would not, in the breach of it, afford any ground of damage upon which the state could recover. It would require some legislative authority for the taking of such a bond, before the state could recover upon it beyond nominal damages.

But although the referee has in his opinion discussed the legal questions applicable to this case in a manner unsatisfactory to the plaintiff's counsel, still I think he has placed his decision also upon a finding on the facts reaching the whole grounds of the claim on which this action was brought. He has found, as matter of fact, that Jewett & Smith did not issue or sell this ticket—and without the finding that the ticket came from them, these defendants, who were their sureties, could not be liable. There is nothing in the act authorizing the purchasers from the managers, under any conditions, to sell out to third persons, either in whole or in part. To make the defendants liable, the tickets must have been issued by Jewett & Smith, or their authorized agents in their names. The referee's finding is to the contrary, and such finding is not contrary to the evidence. Upon this point the evidence is defective, and the plaintiff must fail, even under a different construction of the law from that which I have stated.

Judgment affirmed.